## JUSTINE MEZEIX *v.* PATRICK H. McGRAW.

1. CHANCERY—AMENDED BILL—NOTICE—ENGLISH RULES.—By the English chancery practice, if the amendment of the bill be before answer, no additional subpœna need be served upon the defendant. But he is entitled to the full time for answering, from the time when he is served with notice of the amendment. If the amendment be after answer, and a further answer be required, a subpœna must be served, but service on the defendant's solicitor is sufficient.

2. SAME—NOTICE.—A rule of chancery practice in this state requires that whenever a complainant shall file an amended bill or a supplemental bill, he shall give notice thereof in writing to the opposite party or his solicitor, within twenty days after the same shall be filed, and no *pro confesso* on such amended or supplemental bill shall be taken without proof of such notice, unless process shall have been served upon the opposite party under the amended or supplemental bill.

3. SAME—AMENDED BILL FILED AFTER ANSWER—PRO CONFESSO—FINAL HEARING.— Where the original bill is answered and afterwards an amended bill is filed, and no answer is made, it is error to proceed to the final hearing of the case, without having previously taken the amended bill as confessed.

4. CONTRACTS—CERTAIN CONTRACTS PRIMA FACIE PAYABLE IN CONFEDERATE NOTES.— The statute of 1867 provides that in all cases founded on any promissory note, open account or other contract for the payment of money executed in this state, after the 1st day of May, 1862, and before the 1st day of May, 1865, shall be *prima facie* evidence that the payment was to be made in Confederate treasury notes, unless the contrary appear on the face of said contract.

5. SAME—CASE AT BAR.—Complainant filed a bill to foreclose a mortgage, his claim being founded on a promissory note executed in this state on the 10th of September, 1862. There was no rebutting or countervailng proof to show that the note was not payable in Confederate treasury notes. *Held:* The order of reference to the master should have been for the value of Confederate treasury notes, with interest from the date of said note in United States currency.

Appeal from the chancery court of Adams county. SMILEY, J.

McGraw filed his bill against Mrs. Mezeix, executrix of her husband, to foreclose a mortgage on lands given to secure a note made by the husband in September, 1862. The bill avers that Mezeix gave, by will, all his estate to defendant. It charges that the debt is unpaid, and that

defendant, during the war, by false pretense of a payment or tender of the money, obtained assistance of Federal soldiers, and thus forcibly took and captured from complainant the note and mortgage and still holds them. It avers that the note was for money lent.

Defendant demurred to the bill; demurrer overruled, with leave to answer in ninety days, without prejudice to the trial at the next term. This order was at January special term, 1868. In August, 1868, defendant filed her answer, admiting the execution of the note and mortgage and of the will, etc.; avering that the land was purchased with her means and for her benefit, and title thereto has since been vested in her by decree of the chancery court; that the note was given, not for money, but in renewal of another note secured by mortgage on the same land. In response to the charge that the note has not been paid, and capture of note, and mortgage on false pretense of a payment or a tender, she avers that the tender was duly made in greenbacks; that defendant refused them and demanded gold, and thereupon in August, 1864, when the Federal forces held Natchez under martial law, Mezeix applied to Gen. Brayman, the Federal commander, and he ordered the debt to be paid in greenbacks into the hands of the military, and ordered the mortgage and note also to be delivered up by McGraw to the military, and they afterward delivered the note and mortgage to Mezeix, and so said note was paid, etc. She filed, as exhibit, the receipt of the judge advocate, dated August 8th, 1864, for $2,767, therein described as "being amount in dispute in case of Mezeix v. McGraw, and ordered to be paid over to me by the general commanding."

On the 29th of October, 1868, complainant had leave to amend his bill. The amendment set forth that the note sued on was a renewal of a note given for the mortgaged property in 1860, and secured by a mortgage thereon. On the second day after this amendment the cause was tried, and referred, generally, for an account. The commissioner reported as due the amount of the note, with interest. Defendant excepted

to the report because the note was *prima facie* payable in Confederate money, etc.; exceptions overruled and report confirmed; final decree of foreclosure and sale—all on the 31st of October, 1868.

*Geo. L. Potter*, for appellant.

We present as the first ground of defense to this bill, a military adjudication in the matter of this indebtedness had in a controversy between the parties before the military authorities, and a payment of the debt made in that proceeding pursuant to military order, and a delivering over to the debtor of the note and mortgage given to secure the debt. As between the parties the adjudication was complete and final, if the jurisdiction be admitted, and no supporter of the Federal theory, and no tribunal created under the same theory, can question the fact of jurisdiction. Halleck on International Law, 805. It is true, we present no record of the military proceedings, and the reason is plain. Records are necessary as proofs only in cases where facts are controverted. But, even though it was not thus admitted, the record need not be produced. It is the best evidence of judicial proceedings, but oral testimony not objected to, is as good evidence to establish the fact. In this case the parties, as by common consent, deposed to the military proceedings, and neither can now object to the absence of record evidence.

Our second defense is, that this debt, once due McGraw, has been seized under the act of congress. The money, when paid into the military court, was seized under the 6th sec. of the act of congress, approved July 17th, 1862. Pamphlet Acts, 590. The very money has been collected, and has gone to the account of captured property. The former creditor, McGraw, may be in a condition to recover it, but the debtor has no claim.

It is thus manifest that this case is very different from that assumed by counsel for appellant. It is not the mere case of money deposited by Mezeix, although if it had been McGraw, who twice demanded that deposit, we could not question the

act or deny its force; for he ratified it as a payment of the note. It was not the money of Mezeix, but the debt due to McGraw, that was paid to the military, and it was not " deposited," as counsel assume, but was paid in, pursuant to military order.

We insist third, that this note, made in September, 1862, was, by presumption of law, payable in Confederate money; and the fact that it was a renewal note, does not alter the cause. When the new note was made, the old currency had ceased to exist in the South; its place had been supplanted by the Confederate issues, which were called " dollars," and were the " dollars" referred to in the southern contracts of that day.

If an order of reference was proper in this case, the court should have directed the account to be taken for the value of Confederate money. Such was the ruling in a case decided here a few days since. Although this was a renewal note, it is within the terms of the statute, and is payable, *prima facie,* in Confederate money, and there was no proof to the contrary. It was, therefore, error to order a general account for money, and not for the value of Confederate issues. See acts 1867, p. 373. It was error, fourth, to amend the bill and proceed to trial, without giving defendant an opportunity to answer and show what was the understanding of the parties as to the currency in which the note was to be paid. 1 Barb. Chan. Prac., 224; ib., 120; Story's Eq. Plead., 257.

*S. L. Guice,* on same side.

The military commandant of the district of Natchez was certainly authorized by law to adjudicate and dispose of the controversy between Mezeix and McGraw, and of which Mezeix complained. Then said cause has been adjudicated before the filing of the complainant's bill in the court below; and the defense set up by defendant below is perfect, and the bill should be dismissed.

" Martial law assumes cognizance of matters belonging to

civil as well as criminal jurisdiction; and of matters of merely civil conduct, such as the non-payment of debts, or the like, they are at liberty to decide according to the preponderance of the testimony on either side. Ib., § 469.

"The right of one belligerent to occupy and govern the territory of the enemy while in its military possession, is one of the incidents of war, and flows directly from the right to conquer. Halleck's Laws of War, 777–8; see also 4 Wheat., where it is held that during military occupancy of enemy's territory, all persons are subject to military control, both as to their persons and rights, and the law for their punishment and protection, criminal and civil, is proclaimed by the military chief.

It was not necessary that the evidence in the cause shows no record of adjudication, and, consequently, no defense is made out on the position taken by appellant on that ground.

The will of the conquerer is the law, and that law is administered as experience and practice shows, orally, without any formal complaint or proceedings, and there is no record left to be had or certified; such tribunals are not trammeled by any code of laws. By the laws of war the conquerer is clothed with the authority to will the law and the power to force their will. This was done by the military power in the controversy when the case at bar was before that power.

The evidence in this case shows, perhaps, more written testimony than is usual in a majority of cases disposed of by such authority. There being money involved, and required to be paid, a receipt in writing was given by the judge advocate to Mr. Mezeix, and that circumstance, connected with the fact that the note and mortgage were procured from McGraw by the court, and delivered up to Mezeix, proves the adjudication of the case, so far as Mezeix was concerned.

The office of testimony is to arrive at truth. It does not appear from the record in the case, or the law controlling said authority, that there was any primary or best testimony. All the testimony in the case was what is classed as second-

ary, and as such, all the testimony introduced to prove the former adjudication was admissible, because it was the best testimony that could be had in the case.

If there was any law requiring such tribunals to keep records, or if there had been such a head with a seal of the court to authenticate it (which there is no evidence to show there was), still the bill of McGraw, under his solemn oath, and also his deposition sworn to before the court, admits and testifies to all the material matters in the action of the military court in the case.

The military authority, by right of conquest and by the laws of war, had the jurisdiction of the parties, and the subject matter of the dispute, and undertook to adjudicate the same, and the adjudication is final.

In the ordinary affairs of life, we do not require demonstrative evidence, and to insist upon it would be unreasonable and absurd. The most that can be affirmed of such things is, that there is no reasonable doubt concerning them. 1 Greenl. Ev., 1.

Another point in this cause grows out of a question which was propounded by the defendant below to McGraw, the answer to which was objected to and objection sustained. The question was: "When you applied to get the money, was it not because you were regarded as disloyal, that the money was not given you?" To which ruling of the court defendant excepted, and insisted as we now insist, that that answer to said question would have disclosed the reason from McGraw himself (as we think it circumstantially appears from the testimony), why said money was not paid to him, and why it was turned over into the treasury of the United States for adjudication; and that reason would have disclosed the fact of McGraw's disloyalty, for it appears from the testimony, that Mezeix was a French subject, and the military had no right to treat him as disloyal without special cause, which cause the evidence does not disclose. It is conclusive therefore, that it was the disloyalty of McGraw which deprived him of the money, and we should have been made

acquainted with the fact by his answer to said question. It would have further shown that the military authorities, in turning said money over into the United States treasury, acted in accordance with the laws of the United States. Statutes at Large, 501, § 6, 820, §§ 1-3-6, as captured or seized property, and said military authorities were authorized so to treat said money for two reasons: First, on the grounds of disloyalty; and second, that McGraw, in refusing to take the money of the United States, which was the sinews of the war, not only proved his disloyalty, but was also guilty of the grave offense of depreciating the value and credit of the money, which it was of the first importance to sustain, in order to the means of prosecuting the war successfully. The law also provides a way by which McGraw can pursue his remedy and recover. U. S. Statutes at Large, 820, § 3. But Mezeix has no remedy for said money, as it fulfilled its office for him in the payment of the note and mortgage, which were surrendered to him as satisfied.

The tender of payment and payment of said money into court, was a legal tender to McGraw of said mortgage debt; the date of the note and mortgage being the 16th September, 1862, when the act of congress making the treasury notes of the United States a legal tender was approved February 25, 1862, and demand notes were made a legal tender, March 17, 1862. U. S. Statutes at Large, vol. 12, 348, § 1, and vol. 13, 370, § 2.

*Winchester & North,* for appellee.

It is of secondary importance in this cause, but should not be passed unnoticed, that upon all points of controversy, the *onus probandi* is upon the appellant; and that, wherever the parties are in conflict in their depositions as to facts not otherwise disclosed, there is a failure of proof.

The note and mortgage are unimpeached. It is not pretended that the creditor has been paid. The debt was by no contract or stipulation soluble at the head-quarters of the military, or any bureau of the treasury department of the

United States, at Natchez; and when the money designed for payment was deposited in the first of these places, the debt had been due eleven months.

The creditor never sued the appellant before filing the bill in this cause. The defense of a legal tender is unknown except in a suit by a creditor for his debt; and cannot be received except upon condition of bringing the money tendered into court. And even when the defense is sustained by a compliance with this condition, it is a bar to intervening interest and costs only.

But was there a legal tender? The offer of the debtor to the creditor was of a payment in United States treasury notes. The contract upon which the debt was founded was of a date anterior to the act of congress requiring these notes to be accepted, when offered, as a legal tender of a debt; and this debt could not be discharged by a tender of these notes to the creditor, or by their deposit at a military post or any office of the treasury department. Moreover, there was never in fact a legal tender of these notes. The offer was made upon the impossible condition of a surrender to the debtor of the note and mortgage then in the territory of the insurgent forces.

The defense of a deposit of the money at the headquarters of the United States army, is a fantasy not approachable by any legal invention known to our generation. We can well understand why the debtor should have had a special predilection for the headquarters of Brig. Gen. Brayman, as a place of deposit for his "portable property." Nor do we encounter much difficulty when we attempt to unveil the mystery of a capture, from a loyal citizen, of his valuables, for the solace of an offending rebel, yet languishing for his special treasons under the ban of an extraordinary ostracism. But the deposit was neither a tender nor payment to the creditors. The condition of the latter was far better, in respect of legal remedies, before, than after, the deposit. In a theoretical view of these, if any such there are, besides this, appellant, unarmed by the martial law, it might have been

said of the situation of the creditor, *id certum est quod certum reddi potest*. But this, to the apprehension of a mind at all conversant with the practice of that day, would have been sheer mockery. And this money had, moreover, never yet become the property of the creditor; when last seen, as it sunk into the abyss of the national treasury, it wore the brand of the rebel debtor, and the earmarks of the nondescript Findlay. The deposit had never been solicited by the creditor; it was a voluntary offering made by Findlay as the agent of the debtor, both then engaged in a cotton trade, carried on through the lines of the belligerents. It was all very well that the money finally came to the treasury department, for it was only enemy's property, but of the fruits of an illicit trafic. But by what law did this deposit and appropriation absolve the debtor from his obligation to his creditor? The latter appears to have been very willing, not only to receive, but to keep the money himself; for when he learned that it was in the custody of the military power, and for some reason supposed it subject to his demand, he applied for it; when he was informed that the military bureau of justice declined a cognizance of any cause between him and his debtor, and that the money had been paid into the treasury department, and was there subject to adjudication upon the claim of any person having a right thereto. Upon what legal ground could the creditor demand the money? It never had become his property, and the department certainly had no judicial power for a cognizance and determination of his demand against his debtor. If his note and mortgage had yet been in the custody of the treasury department, he might very properly have applied there for a restitution of the instruments. But, by irregular capture, they had come to the possession of the appellant; and his obvious, and indeed, only remedy, against which there can be no lawful defense, is in a judicial demand from her, of the instruments, with all the relief to which, by them, she is shown to have been entitled, when her rebel husband, by reason of his fears of a loss of his "greenbacks,"

by robbery, or by the insolvency of the United States, sent his agent, Findlay, through the military lines to execute his contrivance for capture to the securities.

The appellant rightly apprehended her situation, when she applied to the treasury department for restitution of the money, supposing it possible to have ever been the property of her husband, and that she could establish for him the status of a loyal citizen.  It has appeared that she is still warm in this pursuit, greatly impeded, without doubt, by the claim of Findlay, who may have been the real owner of the money when deposited with Gen. Brayman.

It cannot escape the scrutiny of the court, that the pleading and proof of the appellant are pregnant with evidence of a fact of worse odor, if possible, than the unwarranted violence inflicted upon the creditor.  It has been made to appear that the rebel, Claudius Mezeix, was, upon some unknown pretense, expelled from the territory occupied by the United States forces, and sent into a cotton region of the insurgents; and that he thereupon successfully prosecuted, through the military lines, a prohibited trade.  How was it that his wife, the appellant, and his agent, Findlay, obtained, in his behalf, a countenance and favor with Brig. Gen. Brayman, and United States volunteers, inducing the latter to a violent capture of the papers, and suspension of the business, of a loyal citizen, residing under the shadow of his headquarters?  By what warrant did this offending rebel tell his wife and Findlay to invoke the benignant interposition of the Provost Marshal of his enemy?  And whence the inspiration of the truculent menace of the wife of Claudius Mezeix, of the destruction of the business of the appellee, and his expulsion from his home, if he did not comply with her wishes?

PEYTON, C. J.:

Claudius Mezeix on the 10th day of September, 1862, at the city of Natchez, in the county of Adams, in this State, made his promissory note for $2,400 payable to Patrick H. McGraw one year from date; and on the 10th day of Septem-

ber, 1862, the said Claudius Mezeix and Justine his wife, executed a deed of mortgage to said Patrick H. McGraw on certain land situated in said county of Adams, to secure the payment of said note.

In the year 1865, the said Claudius Mezeix departed this life, leaving a will by which he gave to his said wife, Justine Mezeix, all his property, real and personal, and appointed her executrix of his said will.

The said Patrck H. McGraw filed his original bill of complaint to the October term of the chancery court of said Adams county, 1867, against the said Justine Mezeix for a foreclosure of the said mortgage, and sale of the property therein specified, for the payment of said note and interest.

The defendant appeared and demurred to the bill for want of equity upon its face, which demurrer was overruled by the court, and the defendant then answered the bill setting up therein certain proceedings in the military court at Natchez as a defense to the bill.

At the October term, 1868, of said court, by leave thereof, the complainant filed an amended bill, and without any legal notice thereof to the defendant, or service of process upon her to appear and answer the same, the court proceeded to a final hearing of the cause, without an answer to the said amended bill, or taking the same *pro confesso* for want of an answer, and ordered a reference to the clerk to take and state an account of the principal and interest due complainant on said note, and that he report the same to the court, and in compliance with said order of reference, the clerk reported that the sum of $3,584 66 was due complainant, of principal and interest on said note. To this report the defendant filed her exceptions on the ground that the note was *prima facie* evidence that the payment thereof was to be made in Confederate treasury notes, and there was no proof of the value of Confederate treasury notes. The exceptions were overruled and the report confirmed, and the court decreed that the defendant pay to the complainant the amount thus found due him within thirty days, and that in

default thereof, the property be sold and the proceeds applied to the payment of the money found due to the complainant.

From this decree the defendant brings the cause to this court by writ of error, and makes divers assignments of error, of which, in the present attitude of the case, it is deemed necessary to notice only the second, fourth and fifth, which are the following : 2. The court erred in proceeding to make an interlocutory order for an account immediately after said bill was amended, without notice to defendant, or an opportunity for her to answer said bill as amended. 4. The said court erred in directing a reference to a commissioner to report an account of principal and interest due complainant upon the note and mortgage. The said note being dated September the 10th, 1862, and due at twelve months, and payable *prima facie* in Confederate treasury notes ; whereas said order of reference, if made at all, should have been for the value of Confederate money with interest. 5. The court erred in overruling the defendant's exceptions to the report of the commissioner and also in confirming said report.

By the English chancery practice, if the amendment of the bill be before answer, it seems that no additional subpœna need be served upon the defendant, but he is entitled to the full time for answering, from the time when he is served with notice of the amendment. If the amendment be after answer, and a further answer be required, a subpœna must be served, but service on the defendant's solictor is sufficient. 1 Daniels' Ch. Pr., 427.

Although it is the practice to call a bill altered an amended bill, the amendment is in fact esteemed but as a continuation of the original bill, and as forming a part of it ; for both the original and amended bill constitute but one record, so much so that where an original bill is fully answered, and amendments are afterwards made, to which the defendant does not answer, the whole record may be taken *pro confesso* generally, and an order to take the bill *pro confesso* as to the amendments only, will be irregular. 1 Daniels' Ch. Pr., 403.

There the complainant amends his bill after answer, if a futrher answer of the amended bill becomes necessary, and is not waived, the defendant must put in a further answer to the amendment; or the complainant will be entitled to an order taking the whole bill as amended as confessed. Trust and Fire Insurance Company v. Jenkins, 8 Paige, 589; Tódder v. Stiles, 16 Georgia, 1.

A rule of the chancery practice in this state, requires that whenever the complainant shall file an amended bill or supplemental bill, he shall give notice thereof in writing to the opposite party or his solicitor, within twenty days after the same shall be filed; and no *pro confesso* on such amended or supplemental bill shall be taken without proof of such notice, unless process shall have been served upon the opposite party under the amended or supplemental bill.

The amendments to the original bill were of such a character as to entitle the defendant to notice of them, either in writing or by service of process. The court below, therefore, erred in proceeding to hear the cause without giving the defendant an opportunity to answer the amended bill. And even had she been notified of the amendments to the bill, it would have been error to proceed to a final hearing of the case, without having previously taken the bill, as amended, as confessed for want of an answer. Beville v. McIntosh, 41 Miss., 516.

The statute of 1867 provides, that in cases founded on any promissory note, open account, or other contract for the payment of money, executed in this state after the first day of May, 1862, and before the 1st day of May, 1865, shall be *prima facie* evidence that the payment was to be made in Confederate treasury notes, unless the contray appear on the face of said contracts.

In this case the complainant's claim is founded on a promissory note, executed in this state on the 10th day of September, 1862, which is *prima facie* payable in Confederate treasury notes, and as there was no rebutting or countervailing proof to show that the note was payable in any-

thing else, the order of reference should have been for the value of Confederate treasury notes, with interest from the date, of said note, in United States currency. The court, therefore, erred in overruling the defendant's exceptions to the report of the commissioner, and in confirming said report.

For these reasons, the decree must be reversed, and cause remanded for further proceedings in accordance with this opinion.

A petition for re-argument was filed, but a re-argument was refused.